## In re CORBIN PARK, L.P., Debtor.

### No. 10–20014.

United States Bankruptcy Court, D. Kansas.

Dec. 16, 2010.

Corbin Park, L.P., pro se.

## ORDER SETTING PRIORITY BE-TWEEN MECHANIC'S LIEN CLAIMANTS AND MORTGAGEE

ROBERT D. BERGER, Bankruptcy Judge.

The sole issue on trial is the determination of priority between the mechanic's lien claimants and the mortgagee led by Bank of America, N.A. as administrative agent for Bank of America, N.A., U.S. Bank N.A., TierOne Bank, Regions Bank, and Compass Bank ("BOA"). The Court has jurisdiction to hear this matter.[1] Based upon the facts and arguments presented as well as pertinent legal authority, the Court finds BOA has priority over the mechanic's lien claimants and hereby enters the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052.

### Findings of Fact[2]

### A. The Parties

Debtor acquired part of a 97–acre, partially developed, shopping center known as Corbin Park on October 8, 2008.[3] Slaggie Architects, Inc., provided Debtor with design services. Brown Commercial Construction Company was a general contractor. O'Donnell & Sons Construction Co.,

Inc., and McCorkendale Construction, Inc., were two of Brown's subcontractors. Ball Kelly, LLC, d/b/a Taylor Kelly, LLC, was a second general contractor. BOA was Debtor's lender.

Corbin Park is comprised of multiple tracts now owned by different entities: Debtor, J.C. Penney Properties, Inc., Von Maur, Inc., and Overland Park Loft Hotels, LLC ("NYLO").[4] Debtor did not take title to the Von Maur site, the J.C. Penney site, or the NYLO Hotel site.[5] The mechanic's lien claimants assert their liens attach to the J.C. Penney tract as well as Debtor's.

### B. Contracts and Construction Prior to October 8, 2008

The prior owners of Corbin Park were 135 Metcalf, LLC, and State Line, LLC[6] (collectively, "135 Metcalf"). 135 Metcalf began developing the property in 2004 through a related entity called Cormac Company. Cormac was essentially 135 Metcalf's in-house developer and agent. Cormac had also hired Slaggie, Brown, O'Donnell and McCorkendale under separate contracts, either verbal or written, to perform services at Corbin Park between

---

1. The parties do not dispute the Court's jurisdiction. The Court finds it has jurisdiction over this proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157.

2. The trial involved 5 days of testimony and 30 exhibit notebooks containing thousands of pages, all of which was thoroughly reviewed by this Court. The Court has culled the material facts and does not attempt to discuss every fact and issue raised—not because they went unnoticed, but because they are deemed immaterial or lacking in credibility.

3. The Court refers to the entity Corbin Park, L.P., as "Debtor" and to the real property as "Corbin Park."

4. These tracts may be identified as being within the perimeter of an inner road. Several more owners hold fee title to tracts located

outside the inner road, including Grier Metcalf, LLC.

5. These exclusions make the Debtor's property look like a piece of Swiss cheese. The comparison is offered to assist the reader in visualizing the property boundaries and to highlight that a visual inspection of the property, which at the time was just graded dirt, would require more than just a cursory glance to determine which tracts were actually under construction at the relevant time.

6. The parties did not mention State Line during trial except to acknowledge it was a co-owner of the real property prior to Debtor; thus, State Line's involvement in this case appears minimal.

2004 and 2008. Construction at Corbin Park has been plainly visible since at least 2007.

Slaggie's involvement began in 2004 with its predecessor, Jantsch, Slaggie & Slaggie. When Slaggie started its own firm, it entered into a verbal contract with 135 Metcalf and later entered into a written agreement.

Brown's employment began in 2007 pursuant to an oral agreement and on a "must do," not "would like to do," basis.[7] The scope of Brown's employment was to ready the land for vertical construction, with the primary goal to prepare the Von Maur and J.C. Penney pad sites.[8] Brown, in turn, hired O'Donnell and McCorkendale for grading, underground utilities, and road work. Brown's and 135 Metcalf's contractual relationship consisted of a series of job orders.[9] Brown invoiced 135 Metcalf monthly. Brown's invoices stated a contract total of $19,543,008; however, Brown presented no evidence 135 Metcalf ever contracted with Brown beyond its immediate need for preliminary site preparation work on a cash-only basis. A representative of 135 Metcalf referred to the $19,543,008 as a master budget, not a contract price with Brown.[10] By September 2008, Brown's and its subcontractors' work was winding down. An owner representative described Brown's work as "specific to sitework completed on the Von Maur parcel [and] a very small amount of work completed on the J.C. Penney's parcel."[11] As for the rest of the site in September 2008, no construction work was being per-formed elsewhere.[12] O'Donnell invoices dated September 2008 are marked as "Von Maur Sitework." McCorkendale invoices are marked as repair jobs and work at the J.C. Penney site. During this time, Brown only invoiced for site supervision, and a Brown employee testified he was performing erosion control and safety fencing. A verified land survey dated September 25, 2008, notes the only work ongoing at that time was on the Von Maur and J.C. Penney sites.

## C. The Ownership Change

By February 2008, 135 Metcalf and Cormac could no longer fund the construction and advised Slaggie and Brown they would need private money or a construction loan to continue. In March 2008, Slaggie and Brown participated in meetings and presentations hosted by 135 Metcalf to attract investors and lenders. In April 2008, 135 Metcalf stopped paying the contractors.

In April 2008, Invesco Ltd. ("Invesco")[13] and BOA emerged as the new sources of funds for Corbin Park. Invesco would eventually invest at least $38 million, and BOA would agree to advance up to $107 million. However, Invesco did not make a capital contribution to 135 Metcalf. Instead, together with Cormac, it formed the Debtor on September 8, 2008. In August 2008, 135 Metcalf notified its contractors it would be closing its contracts with them, and the contractors would be required to enter into new contracts with Debtor.

---

**7.** Brown Ex. Z; Brown Ex. AA.

**8.** *Id.*

**9.** Tim Brown testified his company had several different job numbers to keep track of the separate jobs. Tim Brown Depo. 130:1–5; Brown Ex. AA.

**10.** BOA Ex. 89.

**11.** *Id.*

**12.** *Id.;* BOA Ex. 163.

**13.** Invesco, in turn, represented LACERA, the Los Angeles County Employees' Retirement Association.

The evidence establishes the contractors had actual knowledge of the ownership change prior to Debtor's formation and the BOA closing. In August 2008, 135 Metcalf advised Slaggie that Invesco and BOA required design work going forward on "BOA's collateral" to be under a new, separate contract with Debtor, and the existing contract with 135 Metcalf would "close out."[14] Likewise, 135 Metcalf advised Brown it was required to enter into new contracts with Debtor. In April 2008, Brown, at Invesco's request, had already sent BOA financial information about Brown, and Brown named BOA as a loss-payee on its insurance for Corbin Park. Slaggie and Brown began contract negotiations with Invesco in the summer of 2008.

By September 2008, 135 Metcalf began winding down its involvement with Corbin Park. Contractors and subcontractors were slowing or stopping work because of non-payment and were calling 135 Metcalf often demanding payment. 135 Metcalf advised all contractors they would be paid at closing and requested their bills for work performed so they could be paid. As the closing date was delayed, Slaggie and Brown continued to provide bills.[15] Both Slaggie and Brown witnesses testified they understood the bills were requested so all outstanding work could be paid out of closing proceeds.

**D. The Closing**

On October 8, 2008, 135 Metcalf conveyed the real property to Debtor and J.C. Penney. The dates of the Von Maur and NYLO Hotel transfers are not in the record. Also on October 8, 2008, Debtor and BOA entered into a construction loan agreement together with all agreements necessary to secure the financing ("Closing"). BOA recorded its mortgage on October 10, 2008. The loan proceeds and Invesco's capital investment were used to pay off an existing mortgage and 135 Metcalf's costs for the pre-existing improvements.

135 Metcalf's representatives testified it was their intent to pay all contractors in full at Closing.[16] 135 Metcalf told the contractors their bills would be paid, and Debtor would have a fresh start after Closing.[17] Debtor executed an Owner's Affidavit regarding the absence of any potential liens with the knowledge and intention all contractors would be paid at Closing.

**E. Contracts with Debtor**

Prior to Closing, Slaggie, Brown, and Taylor Kelly negotiated new contracts with Debtor. The contracts were negotiated between experienced, sophisticated parties represented by counsel and many provisions were changed and redlined in the course of negotiations. Slaggie entered into a new contract with Debtor effective September 29, 2008.

Brown entered into two new separate contracts with Debtor. At trial, Brown insisted its written contracts with Debtor memorialized one, ongoing agreement initiated by 135 Metcalf in 2007. However, the evidence conclusively established separate contracts. Brown executed a site administration contract and a construction contract on September 23, 2008, and Debtor executed the agreements on September 30, 2008. The effective date of the contracts was September 16, 2008; however, the construction commencement date under

---

**14.** Slaggie Ex. S–N.

**15.** Jeffrey Johnson Depo. 26:6 to 28:5; 33:22 to 34:13.

**16.** Brian Diedrichsen Depo. 32:5–9; Jeffrey Johnson Depo. 47:6–8.

**17.** Brian Diedrichsen Depo. 36:2–14.

the contracts was contingent upon a notice to proceed issued by the Debtor. The contracts were for a new price. At Invesco's request, Brown required all its subcontractors to rebid their work in order for Brown to offer a guaranteed maximum price for the new contract covering the buildings and remaining site work. The guaranteed maximum price under Debtor's contract was $20,951,448. The master budget for 135 Metcalf had been $19,543,008. The retainage percentage changed from 5 percent under the contract with 135 Metcalf to 10 percent under the contract with Debtor. After October 8, 2008, Brown submitted pay applications to the new owner, the Debtor, beginning with a new numerical sequence beginning with Pay Application #1. Debtor required new payment and performance bonds, which had not been required under the agreement with 135 Metcalf. Brown understood the bond requirements came from BOA. Significant provisions contained only in the new contracts survived through the course of negotiations to execution, including the provisions providing for a new commencement date and the notice to proceed.

Under its new contract with Debtor, Brown could not accommodate the entire scope of work as a sole general contractor because of its bonding capacity limitations. Thus, Debtor entered into two, separate written contracts with Taylor Kelly to be the second general contractor in charge of the J.C. Penney parking garage and the C–1 building. Taylor Kelly did not have a contract with 135 Metcalf and did not perform any work for 135 Metcalf. While negotiating its contracts with Debtor, Taylor Kelly knew financing from BOA was a prerequisite to its commencing work for Debtor. Taylor Kelly executed contracts with Debtor in which it agreed not to start work without obtaining the necessary building permits or without a notice to proceed.

Prior to Closing, Slaggie, Brown, and Taylor Kelly executed consent agreements for the assignment of their contracts with Debtor to BOA as collateral, which not only acknowledged BOA's financing, but also declared no defaults under Debtor's contracts.

## F. The Mechanic's Lien Claimants Commencement Date and the Notice to Proceed

On October 9, 2008, Debtor sent written notice to Brown and Taylor Kelly to proceed with construction under the contracts. The written notice to proceed is the only credible evidence of a notice to proceed under the contracts with the Debtor. The September 2008 Brown contracts state in several places Brown shall not commence work or incur costs under the contracts with Debtor without a notice to proceed. The contracts also required Brown, in the absence of a contractual start date or notice to proceed, to provide Debtor written notice prior to commencing work to permit the timely filing of mortgages.[18] Brown testified he received numerous verbal notices to proceed from Debtor prior to October 9, 2008; however, he also testified his subcontractors had slowed or stopped work in September because they had not been paid for five months.

Other more credible evidence did not corroborate Brown's testimony that Debtor verbally authorized Brown to recommence work prior to October 9, 2008. An email written by Debtor's president con-

---

18. The relevant provisions are: section 2.2.7, section 2.3.1.1, and section 8.2.2. Brown Ex. A and B.

temporaneous with the events of October 2008 questions why O'Donnell and McCorkendale were not on Debtor's site with their equipment. While there was conflicting evidence regarding O'Donnell's and McCorkendale's presence at Corbin Park, the preponderance of the evidence shows they were working on the J.C. Penney and Von Maur tracts.[19] The September 25 land survey noted no work being performed except at the Von Maur and J.C. Penney pad sites.

Taylor Kelly did not perform any lienable work prior to October 10, 2008. Its pre-Closing activities involved setting up its trailer and getting the lay of the land in preparation for actual construction, which did not start for several weeks. Taylor Kelly's contracts with Debtor conditioned its start date upon receipt of a notice to proceed issued by Debtor and receipt of all required permits.[20] The contracts also conditioned commencement upon permitting Debtor time to file its mortgages. Taylor Kelly did not obtain all applicable permits until the end of November 2008. Slaggie testified the plans upon which Taylor Kelly was contracted to build were not complete prior to October 10, 2008. The Taylor Kelly witnesses were not credible regarding its start date. The witnesses' testimony contradicted Taylor Kelly's prior sworn statements and testimony.

Slaggie understood BOA funding was a prerequisite for its work on the project to continue with Debtor as the owner. Likewise, Slaggie required payment of all its 135 Metcalf invoices as a prerequisite for working for Debtor. The Slaggie contracts are separate and show a mutual intent for work under the 135 Metcalf contract to cease and for work to commence under Debtor's contract subordinate to secured financing.

The testimony of all parties show they were aware of the change in ownership, the secured financing, and were waiting for the Closing in order to begin the vertical build and the balance of the site work.

### G. Post–Closing Payments for Work Performed under Contract with 135 Metcalf

Slaggie and Brown were paid at Closing for all bills submitted through August 31, 2008; however, neither Slaggie nor Brown were paid at Closing for all work performed for 135 Metcalf. BOA or its agent missed $132,618 in retainage owed to Brown, and 135 Metcalf neglected to submit Slaggie's invoices for August and September 2008. However, both contractors were eventually paid, including Brown's pre-Closing retainage, which was paid in March 2009.[21]

**19.** The Court reviewed the subcontractors' time sheets, but they generically refer to "Corbin Park." See Brown Ex. B–J, B–N, and B–O. Other documentary evidence is more conclusive, such as the invoices, the survey, and emails written contemporaneously with the events they describe.

**20.** The relevant provision is section 4.1.

**21.** Brown repeatedly testified in his deposition $132,618 in pre-contract retainage remained unpaid, culminating in this exchange:
Q: Did you or anybody at your company have any conversations with Jodi or Cormac or anyone at Corbin Park about get-

ting that retainage paid around December of 2008?
A: We did not.
Q: Did anyone ever submit a form of lien waiver, a final lien waiver that would cover all retention including the 132,000?
. . .
A: No.
BOA Ex. 65, Tim Brown Depo. 181:14–25 to 182:1–7. Brown's March 2009 Pay Application shows the retention was paid, and a lien waiver may be found at Brown Ex. BB–16. At trial, BOA counsel again questioned Brown for about a half an hour about the retainage, but Brown did not respond it had been paid.

After October 8, 2008, Brown submitted invoices for work performed under contract with 135 Metcalf to Debtor.[22] Those invoices were paid, except perhaps for unbilled retainage.[23] The submitted invoices show work had slowed significantly and was limited to the Von Maur and J.C. Penney sites. All work invoiced predated Debtor's ownership of the real property and the notice to proceed. Some of the work predated the effective date of the contract and Debtor's formation as a legal entity. Debtor, through BOA, paid both pay applications for work clearly done under contract with 135 Metcalf.

### Conclusions of Law

### A. General Principles

 Mechanic's liens are governed by K.S.A. § 60-1101:

Any person furnishing labor, equipment, material, or supplies used or consumed for the improvement of real property, under a contract with the owner or with the trustee, agent, or spouse of the owner, shall have a lien upon the property for the labor, equipment, material or supplies furnished at the site of the property subject to the lien, and for the cost of transporting the same. The lien

shall be preferred to all other liens or encumbrances which are subsequent to the commencement of the furnishing of such labor, equipment, material or supplies by such claimant at the site of the property subject to the lien. When two or more such contracts are entered into applicable to the same improvement, the liens of all claimants shall be similarly preferred to the date of the earliest unsatisfied lien of any of them. If an earlier unsatisfied lien is paid in full or otherwise discharged, the commencement date for all claimants shall be the date of the next earliest unsatisfied lien.

The mechanic's lien claimant has the burden of proving itself within the provisions of the statute.[24] A mechanic's lien requires proof of an express or implied contract, written or oral, between the claimant and the owner of the property to which the lien is to attach.[25] The lien's lynchpin is the contract with the owner.[26] The existence of a contract is a question of fact.[27]

 The lien claimant is responsible for knowing the ownership interest of the party with whom he contracts, and a subcontractor is likewise required to know the owner with whom the general contractor

---

Only at the end of his testimony, when the Court directly asked Brown if it had been paid, Brown finally responded it had. The Court later found the lien waiver in the exhibit notebooks.

**22.** Brown Ex. F–1 and F–2. Interestingly, Brown had billed 135 Metcalf once a month since August 2007. However, Brown did not submit a pay application to 135 Metcalf in September 2008, even though Brown had invoices in hand dating from between August 25, 2008, and September 24, 2008. Brown testified he would have liked to have been paid for those invoices at Closing if someone had just asked him. Having observed the witness's testimony and demeanor, the Court found this testimony lacked credibility. Mr. Brown proved himself an experienced busi-

nessman. He did not persuade the Court he needed to be asked for payment.

**23.** Brown's obfuscation surrounding retainage not only affected his credibility, it undermined the mechanic's lien claimants' burden of proof.

**24.** *Tarlton v. Miller's of Claflin, Inc.*, 43 Kan. App.2d 547, 549, 227 P.3d 23 (2010).

**25.** *Construction Materials, Inc. v. Becker*, 8 Kan.App.2d 394, 397, 659 P.2d 243 (1983).

**26.** *Lang v. Adams*, 71 Kan. 309, 311, 80 P. 593(1905).

**27.** *Tarlton*, 43 Kan.App.2d at 550, 227 P.3d 23.

contracts.[28] Where work is performed under a single, continuous contract with one owner, a single lien attaches from the date work is first performed under the contract. Installment payments do not sever the contract and cause the lien to attach at a later date for unpaid work only.[29]

■■■■ A change of ownership accompanied by separate contracts requires separate liens. When a new contract is entered between different parties, the new contract will be separate and distinct from the old and will not have priority over a mortgage executed before the second contract.[30] The lien statement must name the owner who contracted for the materials, not the owner when the lien statement is filed.[31] Where labor or materials are furnished under successive contracts, the prior, completed contract cannot be tacked to a subsequent contract so as to enlarge the time for filing a lien. A lien must be filed for what was done or furnished under each separate contract within the statutory period after each contract's completion or abandonment.[32] This is especially true where the contracts are between the same lien claimant but different owners.[33] A

mechanic's lien may be superior to the interest of a subsequent purchaser even if no lien statement is filed until after the conveyance. However, the mechanic's lien attaches for the work performed under the contract with the prior owner. Thus, the contractor must file his lien within four months of the contract being terminated or abandoned by the prior owner. The contractor may not name the subsequent purchaser as the owner for work contracted for by the prior owner,[34] nor may the contractor enlarge his time to file his lien by tacking the prior owner's contract to a separate contract with a subsequent purchaser.[35]

■■■■ A mechanic's lien can only attach by virtue of the statute as applied to the facts, and no lien can be created by force of equitable rules. However, courts are established for the purpose of doing justice and not to assist a party to obtain an unconscionable advantage.[36] In the enforcement of mechanic's liens, courts apply equitable as well as legal principles when the circumstances justify or require that to be done.[37] The cardinal maxim of equity

28. *Lang v. Adams,* 71 Kan. at 311, 80 P. 593.

29. *Davis Electric, Inc. v. Showalter,* 31 Kan. App.2d 318, 64 P.3d 456 (2003).

30. *See, e.g., May v. Mode,* 142 Mo.App. 656, 123 S.W. 523, 525–26 (1909) (a contract with a new owner can not be tacked to the contract of the prior owner to defeat an intervening deed of trust).

31. *Tarlton,* 43 Kan.App.2d at 550, 227 P.3d 23; *Constr. Materials,* 8 Kan.App.2d at 399, 659 P.2d 243.

32. *Unit Sash & Sales Co. v. Early,* 117 Kan. 425, 426, 232 P. 232 (1925).

33. 56 CGS Mechanics' Liens § 137; *see, e.g., Hanna Lumber Company v. Wilkins,* 444 P.2d 213 (Okla.1968) (lien claimant furnishing labor and materials for construction was paid for completion of specified portion of work

prior to discontinuance of construction; unfinished project was sold to a new owner who re-financed from new lender under mortgage recorded prior to recommencement of work; and lien claimant had notice of change in ownership and new financial arrangement; thus, lien claimed for additional work was junior to mortgage).

34. *Lang v. Adams,* 71 Kan. 309, 80 P. 593.

35. *Unit Sash & Sales Co.,* 117 Kan. at 427, 232 P. 232; *Hanna Lumber Company v. Wilkins,* 444 P.2d 213.

36. *E.W. Smith Lumber Co. v. Arnold,* 88 Kan. 465, 471, 129 P. 178(1913).

37. *Boyce v. Knudson,* 219 Kan. 357, 363, 548 P.2d 712 (1976) (equitable principles allow corrections where the parties are not misled and third parties have not intervened).

provides that what was agreed to be done and should have been done will be treated as if the acts contemplated by the parties had been done at the beginning of the transaction so as to promote substance over form.[38]

■ Unrecorded mortgages are valid against mechanic's lienholders if the lienholders have actual notice of the mortgages.[39]

■ Contractors cannot artificially cause their mechanic's liens to attach by simply having one or more of its employees or subcontractors performing inconsequential activities at the site.[40]

## B. The Kansas Legislature's Response to *Mutual Savings Ass'n v. Res/Com Properties*

■ The Kansas Legislature amended K.S.A. § 60–1101 in 2005 in response to *Mutual Savings Ass'n v. Res/Com Properties, L.L.C.*[41] *Mutual Savings* held the priority date for all contractors and subcontractors could be established by a contractor who had been paid in full if the contractor had held an unsatisfied lien on the date the mortgage was recorded. The Legislature changed this result by adding the last sentence to the statute: "If an earlier unsatisfied lien is paid in full or otherwise discharged, the commencement date for all claimants shall be the date of the next earliest unsatisfied lien." Thus, unsatisfied liens held as of the mortgage record date are irrelevant if the liens are later paid or discharged. Mechanic's lien claimants may not relate back to the commencement date of another contractor if that contractor has been paid—regardless when payment is made. The Legislature also added, "at the site of the property subject to the lien" in the first sentence of the statute to clarify that lienable labor, equipment, material or supplies must be furnished at the site.[42]

## Analysis

■ The mechanic's lien claimants argue the ownership change was inconsequential; they were first on site working under one, continuous contract; and they are therefore first in priority. BOA argues all parties knew of and shared a common intent for the mechanic's lien claimants to be paid in full for work performed at the behest of 135 Metcalf; BOA would loan Debtor ongoing construction funds in exchange for the first priority lien; 135 Metcalf obligations would cease, and Debtor would take ownership of Corbin Park with its pre-existing improvements and begin with a fresh start in terms of future construction. BOA prevails based on the evidence presented and Kansas law. The mechanic's lien claimants fail to carry their burden of proof, in part, because their witnesses lacked credibility, and *Mutual Savings* does not control.

The material facts established at trial are (1) the change in ownership from 135

38. *Hill v. Hill*, 185 Kan. 389, 400, 345 P.2d 1015 (1959).

39. *Shade v. Wheatcraft Indus., Inc.*, 248 Kan. 531, 539, 809 P.2d 538 (1991); K.S.A. § 58–2223 ("No such instrument [affecting real estate] in writing shall be valid, except between the parties thereto, *and such as have actual notice thereof,* until the same shall be deposited with the register of deeds for record." (Emphasis added)).

40. *Suitt Constr. Co., Inc. v. Hill*, 150 P.3d 335, 2007 WL 219960, at *6 (Kan.App.) (Unpublished decision) (interpreting pre–2005 K.S.A. § 60–1101).

41. 32 Kan.App.2d 48, 79 P.3d 184 (2003).

42. 2005 Kan. Sess. Laws 336, ch. 95 (S.B. 112).

Metcalf to Debtor; (2) the separateness of the pre- and post-Closing contracts; and (3) the mechanic's lien claimants' actual knowledge that first priority secured financing was a prerequisite to their employment by the Debtor. Under Kansas law, separate contracts mean separate liens. Liens for work performed under 135 Metcalf's contracts would have had priority over Debtor and BOA, had they been timely filed. However, work performed under contracts with Debtor created separate lien rights which can not be tacked to the former owner's contracts. The mechanic's lien claimants' actual knowledge of the secured financing prohibits them from denying the intervening mortgage's priority.

■ A mechanic's lien can only be created "under a contract with the owner." The evidence shows the contractors entered into contracts with the Debtor in September 2008. The contracts were separate from the agreements the contractors had with the prior owner. The Debtor's contracts involved a different owner, a different price, and significantly different terms. The contractors may not tack Debtor's contracts to agreements made with 135 Metcalf in order to extend the time to file liens.[43] The Debtor's formation was not a mere continuation of 135 Metcalf or an inconsequential name change. Invesco brought significant capital, a new entity, and new ownership to Corbin Park. There is no credible evidence the contractors worked under a single contract. The contractors argue their scope of work included the pre-Closing improvements; however, the pre-Closing improvements were not contracted for by the Debtor. A subsequent purchaser may buy the land with its pre-existing improvements and proceed anew. If the contractors are not paid for the improvements, their remedy is to file a lien naming the prior owner who contracted for the improvements within four months of the prior contract's end. If the lien is timely filed, the new owner may satisfy the lien to free its land of the prior encumbrance, but *the new owner does not take on the contractual obligations of the prior owner by so doing.* If the lien is not timely filed, then the claim against the real property is lost pursuant to the statute, and the contractor must look to the prior owner under breach of contract. Under revised K.S.A. § 60–1101, BOA could pay 135 Metcalf's obligations at any time in order to rid the property of prior liens. The date BOA recorded its mortgage is not determinative.

In this case, the evidence shows all parties understood 135 Metcalf's obligations were to be "closed out" and paid. If the contractors failed to bill and collect all amounts due, it was incumbent upon them to pursue payment and file their liens within four months of 135 Metcalf exiting the project.[44] The evidence established 135 Metcalf, Debtor, or BOA paid all bills presented which covered work performed under contract with 135 Metcalf, albeit not at Closing. If any amounts remain unpaid, the time for filing a lien for work performed under an agreement with 135 Metcalf has passed.

---

**43.** *Unit Sash,* 117 Kan. at 425, 232 P. 232.

**44.** At trial, Brown proved BOA missed the $132,618 retainage billed in the last pre-Closing pay application. However, this amount was paid in March 2009, and despite testimony to the contrary, Brown executed a Final Conditional Waiver and Release. Even if Brown was referring to retainage for site administration work or for a subcontractor's work at the J.C. Penney site in September 2008, Brown failed to prove it still has a viable lien for such charges.

The mechanic's lien claimants did not carry their burden to persuade the Court they were on Debtor's property performing work which improved the property under a contract with Debtor prior to October 10, 2008. Debtor's contracts contained the contractors' promise not to begin work without a notice to proceed. The documents were fairly negotiated, and the parties understood the first requirement was for financing with BOA to close and a mortgage recorded. Although there is conflicting evidence, weighing the statements of the mechanic's lien claimants against the owner's statements made in 2008, the verified survey, and the written contracts executed by experienced, sophisticated construction companies, the Court finds the preponderance of the evidence established the mechanic's lien claimants' commencement date *under a contract with the owner* did not occur prior in time to BOA's mortgage. If the contractors were performing lienable work on Debtor's property prior to October 9, they were there without Debtor's knowledge or consent and in breach of their agreements. But, the evidence did not establish they were working on Debtor's property. Several more credible sources say the contractors had understandably slowed or ceased work because 135 Metcalf was not paying them. What work did continue was limited to the J.C. Penney and Von Maur tracts. The mechanic's lien claimants' testimony was not credible regarding their commencement date, in part, because they refused to acknowledge the significance of the ownership change and the written agreements they negotiated and executed.[45]

The *Mutual Savings* case, upon which the contractors so heavily relied, is not on point and is of questionable precedential value because of the Kansas Legislature's subsequent response to it.[46] *Mutual Savings* set priority based upon a paid contractor's lien which had attached prior to a change in ownership and was superior to the subsequent purchaser and its lender.[47] The Kansas Legislature amended the statute to reject *Mutual Savings'* holding that the mortgage record date was the date by which it determined who was an unsatisfied lienholder for priority purposes. *Mutual Savings* never addressed the singleness of a contract or different owners, and the mortgage record date is no longer the deadline by which potential, unrecorded liens must be paid under K.S.A. § 60–1101. *Mutual Savings* therefore provides little or no guidance and can not be reconciled with Kansas Supreme Court cases which prohibit tacking of successive contracts,[48] especially when different owners are involved. As a result of the Kansas Legislature's amendment, a party such as a subsequent purchaser or its lender may

---

45. The mechanic's lien claimants also name J.C. Penney as owner of Tract 2 in their lien statements. Like Debtor, J.C. Penney took title to Tract 2 over a year before the lien statements were filed. This further illustrates why the mechanic's lien claimants' argument fails—they attempt to enforce a lien against *Debtor*, for work contracted for by 135 Metcalf on J.C. Penney's property.

46. Federal courts applying state law are bound by the decisions of the state's highest court, but not the decisions of the state's intermediate appellate courts. *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240 (10th Cir.2003). While state appellate court decisions are accorded some deference, they are not binding on federal courts, especially when it appears the highest state court has decided or would decide the issue differently.

47. *Mutual Savings Assn.*, 32 Kan.App.2d at 53–54, 79 P.3d 184.

48. *Lang v. Adams*, 71 Kan. at 309, 80 P. 593; *Unit Sash & Sales Co.*, 117 Kan. at 425, 232 P. 232.

satisfy, at any time, liens which attached prior to their interest in the property. Encumbrances attaching after the mortgage can not relate back to satisfied or discharged liens. The mortgagee does not have to obtain a lien waiver or subordination agreement because the lien is discharged upon payment.

The fact Brown and Slaggie were not paid in full at Closing is irrelevant under amended K.S.A. § 60–1101. Brown and Slaggie were either paid in subsequent months or are out of time to file liens for 135 Metcalf work. They can not relate back their commencement date under Debtor's contract to work performed under their contracts with 135 Metcalf or any other 135 Metcalf contract.

Additionally, unlike the other cases relied upon by the contractors, the evidence in this case conclusively established the contractors' actual knowledge of the pending mortgage accompanying the change in ownership. An unrecorded mortgage is valid against mechanic's lienholders if the lienholders have actual notice of the mortgage. The Kansas Supreme Court in *Shade* stressed the outcome of that case would have been different if the lienholders had actual knowledge of the mortgage. Part of the reason for priming the purchase money mortgage in *Shade* was to discourage lenders from holding secret mortgages, allowing their collateral to be improved at the mechanic's lienholders' expense, then foreclosing upon the property and improvements. Those facts are not present in this case. The contractors were not only aware of the BOA financing, but Slaggie and Brown actively participated to solicit it. The mechanic's lien claimants did not show BOA had any intention to hide its mortgage or attempt to avoid full payment for the pre-Closing improve-

ments. To the contrary, BOA conclusively established its intent to pay for all outstanding work. If the lienholders and 135 Metcalf had submitted updated bills, they would have been paid. In fact, they eventually were paid, albeit not at Closing.

Brown, Slaggie, and Taylor Kelly had actual knowledge a new owner was acquiring the development and BOA financing would be a first priority lien. Brown, Slaggie, and Taylor Kelly had actual knowledge new contracts with Debtor were required as a prerequisite to work for Debtor. Brown, Slaggie, and Taylor Kelly had actual knowledge the construction loan was being obtained, prior contracts would be "rolled-up" or "closed out," and a new entity, the Debtor, would own, direct, and contract for future construction. Brown and Taylor Kelly signed contracts with Debtor acknowledging their work would not commence prior to allowing time for the mortgage to be filed. Slaggie understood it would commence work subordinate to the secured financing. Under these facts, lien waivers and subordination agreements would only have subordinated potential liens filed against 135 Metcalf's obligations.[49] If the contractors had filed such liens, they would have primed BOA's mortgage. However, no contractor timely enforced a lien for work performed under 135 Metcalf's contracts. The substance of the Debtor's transaction was firmly established in 2008 and at trial. The contractors agreed with Debtor that Debtor would obtain financing prior to commencing construction as the new owner of Corbin Park. Thus, the priorities were set at the outset.

IT IS SO ORDERED.

---

49. The evidence shows BOA did not want potential liens against 135 Metcalf subordi-nated—it wanted them paid and fully discharged.