In re CORBIN PARK, L.P., Debtor.

Brown Commercial Construction Company, Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

In re Corbin Park, L.P., Debtor.

O'Donnell & Sons Construction Company, Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

In re Corbin Park, L.P., Debtor.

Arr Roofing, LLC, doing business as Boone Brothers Roofing, Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

In re Corbin Park, L.P., Debtor.

Wachter Electric Company, Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

In re Corbin Park, L.P., Debtor.

McCorkendale Construction, Inc., Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

In re Corbin Park, L.P., Debtor.

Ball Kelly, LLC, Appellant,

v.

Corbin Park, L.P., and Bank of America, N.A., Appellees.

BAP Nos. KS–10–084, KS–10–085, KS–10–086, KS–10–088, KS–

11–001, KS–11–004.
Bankruptcy No. 10–20014.

United States Bankruptcy Appellate Panel
of the Tenth Circuit.

May 7, 2012.

576

Mark T. Benedict (David A. Schatz and Kathryn Goldsmith Lee with him on the briefs) of Husch Blackwell LLP, Kansas City, MO, for Appellant Brown Commercial Construction Company.

T. Bradley Manson of Manson Karbank Burke, Overland Park, KS, for Appellant O'Donnell & Sons Construction Company.

Thomas J. Fritzlen, Jr. (Steven M. Leigh, Desarae G. Harrah, Kevin J. McManus, and Carrie D. Mermis with him on the briefs) of Martin, Leigh, Laws & Fritzlen, P.C., Kansas City, MO, for Appellee Bank of America, N.A.

Before CORNISH, Chief Judge, MICHAEL, and THURMAN, Bankruptcy Judges.

CORNISH, Chief Judge.

Two general contractors and four subcontractors appeal the bankruptcy court's order determining that, under Kansas law, the interest of a construction lender/mortgagee in a retail shopping center development has priority over their mechanic's lien claims. Having thoroughly reviewed the record and applicable law, we conclude that the bankruptcy court committed no

reversible error in determining the priority of interests between these claimants. Therefore, we must affirm the bankruptcy court's order.

## I. BACKGROUND FACTS[1]

Debtor Corbin Park, L.P. ("Debtor") owns a large portion of a partially developed 97–acre shopping center known as "Corbin Park" (the "Property"),[2] which is located at the intersection of Metcalf Avenue and West 135th Street in Overland Park, Kansas. Debtor acquired the Property from previous owners and developers State Line, LLC and 135 Metcalf, LLC (collectively "Metcalf"). Metcalf began developing the Property in 2004 through a related entity called Cormac Company ("Cormac"),[3] and hired appellant Slaggie Architects, Inc. ("Slaggie") to provide the design. In 2007, Metcalf hired appellant Brown Commercial Construction Co. ("Brown") as its general contractor to ready the Corbin Park site for vertical construction. Pursuant to the verbal and written agreements between Metcalf and Brown, appellants O'Donnell & Sons Construction Co., Inc. ("O'Donnell")[4] and McCorkendale Construction, Inc. ("McCorkendale") were hired as subcontractors for grading, underground utilities, and road work on the Property.[5] Construction and improvements were plainly visible at the Corbin Park site beginning in 2007.

In February 2008, Metcalf advised Slaggie and Brown that it was no longer able to fund the construction, and that new private investment and/or a construction loan would be necessary in order to continue the project. In March 2008, Metcalf held meetings and made presentations to attract investors in which both Slaggie and Brown participated. In April 2008, Metcalf stopped paying its contractors. About the same time, appellee Bank of America ("BOA") and Invesco Ltd. ("Invesco") emerged as potential new funding sources for the project. In August 2008, anticipating the sale of Corbin Park, Metcalf informed its contractors that it would be closing its contracts with them, and that they would be required to enter into new contracts with the purchaser. Slaggie and Brown then began contract negotiations with Invesco.

Invesco did not invest funds in Metcalf directly. Instead, on September 8, 2008,

---

1. The following is a general overview of the facts giving rise to this appeal. Unless otherwise noted, the facts are taken from the bankruptcy court's order, which is published at *In re Corbin Park, L.P.*, 441 B.R. 370 (Bankr. D.Kan.2010). Additional detailed factual findings upon which the bankruptcy court's ruling are premised will be discussed in the analysis section below within the context of the errors on appeal asserted by the appellants.

2. At the time of trial, various tracts of Corbin Park were owned by Debtor, J.C. Penney Properties, Inc., Von Maur, Inc., and Overland Park Loft Hotels, LLC. Thus, the term "Property" is used to refer only to the portion owned by Debtor.

3. Cormac, who performed the initial development work on the Property, was an in-house agent of Metcalf, the principals of which were Jeff and Jerry Johnson. Thus, the contracts between the Property owners and the various contractors were with Cormac in the beginning. In 2008, Cormac joined with Invesco Ltd. ("Invesco") to form the Debtor and purchase the Property.

4. According to O'Donnell, it commenced grading, excavating, and roadway work on the Property in 2003. In September 2004, it executed a written contract with Metcalf to continue working on the Property. And in 2005, it continued to work on site under a written contract with D.A. Davis Co., Inc. O'Donnell's Supplemental Brief at 4–5.

5. Brown's other subcontractors include appellants ARR Roofing, LLC and Wachter Electric Co.

Invesco and Metcalf's in-house agent Cormac formed Debtor, a new limited partnership, for the purpose of purchasing the Property.[6] After formation of Debtor, but prior to closing of the sale of the Property, Brown and Slaggie entered into new written agreements with Debtor. Slaggie entered into a new contract with Debtor having an effective date of September 29, 2008. Brown required its subcontractors to rebid their work so it could offer Debtor a guaranteed maximum price covering the buildings and remaining site work. Debtor and Brown then executed two written contracts, one a construction contract and the other a site administration contract. The contracts were signed by Brown on September 23, 2008, and by Debtor on September 30, 2008, but had an effective date of September 16, 2008. Notwithstanding the effective date of the contracts, the construction commencement date was dependent upon a written notice to proceed from Debtor. Additionally, Brown could not accommodate the entire scope of work on the Corbin Park project because of its bonding capacity limitations. Therefore, Debtor entered into two, new written contracts with a second general contractor, Taylor Kelly.[7]

The sale closed on October 8, 2008, and Metcalf conveyed the Property to Debtor. Other pieces of Corbin Park were conveyed to J.C. Penney Properties, Inc., Von Maur, Inc., and Overland Park Loft Hotels, LLC.[8] On the same day, Debtor and BOA executed a construction loan agreement, together with all agreements necessary to secure the financing for continuation of the Corbin Park project. The next day, Debtor sent written notice to proceed with construction under the contracts to Brown and Taylor Kelly. BOA recorded its mortgage on October 10, 2008. Funds from the BOA loan proceeds and Invesco's capital investment were used to pay off an existing mortgage on the Property and most of Metcalf's costs for the pre-existing improvements, which included the invoices submitted by Brown and its subcontractors for work performed up to August 24, 2008, under the contracts with Metcalf. None of the contractors filed a mechanic's lien of record against the Property with respect to work performed under contract with Metcalf.

Construction on the Property continued into late summer of 2009 until Debtor failed to make payments. Brown issued a stop work notice to its subcontractors on August 6, 2009.[9] Brown and its subcontractors filed mechanic's liens against the Property in September and October 2009.[10] Several contractors filed mechanic's lien enforcement actions in Kansas state court.[11] Debtor then filed its present Chapter 11 petition on January 5, 2010.

BOA quickly filed a motion for emergency relief from stay, or in the alternative to winterize Debtor's property and receive a priority claim and lien.[12] The contractors objected, and on February 9, 2010, Debtor filed a motion to establish procedures for the resolution of the mechanic's lien claims

---

**6.** Invesco eventually invested at least $38 million, and BOA agreed to advance up to $107 million.

**7.** "Taylor Kelly" is a d/b/a for appellant Ball Kelly, LLC.

**8.** As a visual aid, the bankruptcy court described Debtor's Property as looking "like a piece of Swiss cheese."

**9.** Brown's Opening Brief at 8.

**10.** *Id.* at 8–9.

**11.** *See id.* at 9; O'Donnell's Supplemental Brief at 6.

**12.** *See Entry No. 17 on Bankruptcy Docket Sheet, in* Brown's App. at 3–4.

and other interests against property of the estate.[13] On March 8, 2010, the bankruptcy court entered an order establishing procedures for resolving the mechanic's lien claims against the Property.[14]

After discovery and briefing, the bankruptcy court began a five-day evidentiary trial on November 1, 2010, during which it admitted 30 exhibit notebooks containing thousands of pages. The mechanic's lien claimants argued they began work under their September 2008 contracts with Debtor prior to the filing of BOA's mortgage. They also argued that the change in ownership of the Property was inconsequential, and thus they were first on site working under one, continuous contract, giving them first priority. BOA argued that all parties knew of and shared a common intent for the mechanic's lien claimants to be paid in full for work performed under contract with prior owner Metcalf, and that BOA would loan Debtor ongoing construction funds only in exchange for fresh start and a first priority lien.

The bankruptcy court entered its order setting priority between the mechanic's lien claimants and the mortgagee on December 16, 2010, ruling that BOA's interest in the Property had priority over the mechanic's lien interests of the contractors. General contractors, Brown and Taylor Kelly, and subcontractors O'Donnell, McCorkendale, ARR Roofing, LLC, and Wachter Electric Co. (collectively the "Contractors") timely appealed the bankruptcy court's priority determination to this Court.[15]

## II. APPELLATE JURISDICTION

This Court has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[16] None of the parties elected to have this appeal heard by the United States District Court for the District of Kansas. The parties have therefore consented to appellate review by this Court.

 A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " [17] An order fixing the priority of a creditor's claim is a final order for appeal purposes.[18]

## III. STANDARD OF REVIEW

 For purposes of standard of review, decisions by trial courts are tradi-

---

13. *See Entry No. 81 on Bankruptcy Docket Sheet, in* Brown's App. at 11.

14. *See Entry No. 109 on Bankruptcy Docket Sheet, in* Brown's App. at 14.

15. Although Slaggie also appealed the bankruptcy court's order, it since reached a settlement with BOA. Pursuant to those parties' *Joint Stipulation and Dismissal of Appeal with Prejudice*, its appeal was dismissed August 9, 2011, at *Docket No. 91*, BAP No. KS–10–87. Appellant O'Donnell joined in Brown's briefs on appeal and also filed its own supplemental brief. Appellants McCorkendale, ARR Roofing, LLC, Wachter Electric Co., and Ball Kelly all joined in Brown's briefs, but did not file separate briefs.

16. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002; 10th Cir. BAP L.R. 8001–3.

17. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

18. *In re Geneva Steel Co.,* 260 B.R. 517, 520 (10th Cir. BAP 2001), *aff'd,* 281 F.3d 1173 (citing *In re Kids Creek Partners, L.P.,* 200 F.3d 1070, 1074 (7th Cir.2000)).

tionally divided into three categories, denominated: 1) questions of law, which are reviewable *de novo;* 2) questions of fact, which are reviewable for clear error; and, 3) matters of discretion, which are reviewable for abuse of discretion.[19] The errors raised in this appeal are primarily questions of fact, but others have been framed as questions of law. *De novo* review of legal questions requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[20] A factual finding is "clearly erroneous" when " 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.' "[21]

## IV. ANALYSIS

 On appeal, we are asked to reverse the bankruptcy court's determination that the mortgage interest in the Property has priority over the mechanic's lien claims. BOA's secured interest was perfected against the claims of third parties on October 10, 2008, when it filed its mortgage of record two days after closing of the sale of the Property and the construction loan agreements with Debtor. At issue is when the Contractors' mechanic's liens attached to the Property. The Kansas mechanic's lien statute, codified at Kansas Statutes § 60–1101, provides as follows:

> 60–1101. Liens of contractors; priority
>
> Any person furnishing labor, equipment, material, or supplies used or consumed for the improvement of real property,

under a contract with the owner or with the trustee, agent or spouse of the owner, shall have a lien upon the property for the labor, equipment, material or supplies furnished at the site of the property subject to the lien, and for the cost of transporting the same. The lien shall be preferred to all other liens or encumbrances which are subsequent to the commencement of the furnishing of such labor, equipment, material or supplies by such claimant at the site of the property subject to the lien. When two or more such contracts are entered into applicable to the same improvement, the liens of all claimants shall be similarly preferred to the date of the earliest unsatisfied lien of any of them. If an earlier unsatisfied lien is paid in full or otherwise discharged, the commencement date for all claimants shall be the date of the next earliest unsatisfied lien.[22]

Accordingly, to determine whether the mechanic's liens have priority over BOA's mortgage, the relevant inquiries are whether the Contractors: 1) furnished labor, equipment, material, or supplies; 2) for improvement of the Property; 3) under a contract with Debtor; 4) prior to filing of BOA's mortgage. It is undisputed that *at some point* the Contractors furnished lienable labor and materials under a contract with Debtor giving rise to valid mechanic's liens on the Property. On appeal, the critical question is whether those liens have priority because the Contractors furnished lienable labor and materials *under a contract with Debtor prior to filing of*

---

**19.** *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1370 (10th Cir. 1996).

**20.** *Salve Regina Coll. v. Russell,* 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

**21.** *Las Vegas Ice & Cold Storage Co. v. Far W. Bank,* 893 F.2d 1182, 1185 (10th Cir.1990) (quoting *LeMaire ex rel. LeMaire v. United States,* 826 F.2d 949, 953 (10th Cir.1987)).

**22.** Kan. Stat. Ann. § 60–1101.

***BOA's mortgage.*** As mechanic's lien claimants, the Contractors have the burden of bringing themselves clearly within the provisions of the statute.[23] The mechanic's lien statute must be "followed strictly with regard to the requirements upon which the right to lien depends."[24]

Brown argues the mechanic's liens relate back to August 24, 2008, the first day of work billed under its contracts with Debtor, and constitute first priority liens and security interests in the Property.[25] Brown asserts four errors on appeal in which the other Contractors join. Additionally, in its supplemental brief, O'Donnell argues it was uniquely situated because it began working on Debtor's Property in 2003, and the bankruptcy court neglected to apply controlling Kansas case law. The five errors raised on appeal are as follows:

A. The bankruptcy court erred in finding that Brown did not perform lienable work on Debtor's Property with its own forces prior to BOA's mortgage;[26]

B. The bankruptcy court erred in finding that Brown and its subcontractors were not performing work on Debtor's Property during the first week of October 2008;[27]

C. The bankruptcy court erred in finding that Brown was in breach of the construction contract and that breach defeated its priority;[28]

D. The bankruptcy court erred in its application of *Shade v. Wheatcraft Industries, Inc.* and in finding that Brown's knowledge that BOA would provide secured financing at some future date defeats Brown's priority;[29] and

E. The bankruptcy court erred in finding that *Mutual Savings Association v. Res/Com Properties, L.L.C.* was not controlling precedent.[30]

██ Brown's alleged errors on appeal are primarily disagreements with the bankruptcy court's factual findings. Disagreements with a trial court's findings of fact are reviewed under a clearly erroneous standard, defined as:

Findings of fact are clearly erroneous when they are unsupported in the record, or if after our review of the record we have the definite and firm conviction that a mistake has been made. If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. This admonition applies equally regardless of whether the trial court's factual findings are based on credibility determinations or on documentary evidence.[31]

"In practice, the 'clearly erroneous' standard requires the appellate court to uphold any [trial] court determination that falls

23. *Haz–Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 910 P.2d 839, 843 (1996); *Tarlton v. Miller's of Claflin, Inc.*, 43 Kan.App.2d 547, 227 P.3d 23, 26 (2010).

24. *Haz–Mat Response*, 910 P.2d at 843.

25. Brown's Opening Brief at 10.

26. *Id.* at 15.

27. *Id.* at 33.

28. *Id.* at 25.

29. *Id.* at 46.

30. O'Donnell's Supplemental Brief at 3.

31. *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir.2009) (citations and internal quotation marks omitted).

within a broad range of permissible conclusions." [32]

As discussed below, we are unpersuaded by any of the Contractors' arguments on appeal. After thoroughly reviewing the extensive record and applicable Kansas law, we do not have a definite and firm conviction that the bankruptcy court made a mistake with respect to its factual findings. Further, the arguments Brown makes regarding alleged legal errors are based on Brown's inaccurate characterizations of the bankruptcy court's holding in this case. O'Donnell's additional legal argument regarding controlling precedent similarly misses the mark.

### A. The bankruptcy court's finding that Brown did not perform lienable work on Debtor's Property with its own forces prior to BOA's mortgage is not clearly erroneous.

In its first assignment of error, Brown argues the bankruptcy court erroneously found that it did not perform lienable work on Debtor's Property prior to the filing of BOA's mortgage on October 10, 2008. Brown's argument in this regard is premised on several faulty assertions.

Initially, Brown asserts the bankruptcy court "accepted" as evidence both the trial testimony of a Brown employee, and Brown's Pay Applications 1 and 2, and that such evidence supports a conclusion that Brown performed site administration work on the Property prior to October 10, 2008. Further, Brown asserts the bankruptcy court improperly ruled that such work was inconsequential and did not constitute an "improvement of property" that would give rise to a mechanic's lien.[33] In its effort to demonstrate error, Brown misconstrues the bankruptcy court's ruling.[34]

The bankruptcy court did not conclude, as Brown argues, that it performed work during the critical time period but that such work was not consequential enough to create a lien. Instead, the bankruptcy court concluded the Contractors did not prove they performed work on Debtor's property prior to filing of BOA's mortgage, and further, that if they did, such work was not performed "under the contract with the owner," as required by the mechanic's lien statute.[35] As expressed by the bankruptcy court:

> The mechanic's lien claimants did not carry their burden to persuade the Court they were on Debtor's property performing work which improved the

---

**32.** *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

**33.** Brown's Opening Brief at 19.

**34.** In fact, several of Brown's alleged errors on appeal appear to be somewhat strained. Perhaps this is because the Contractors' main argument before the bankruptcy court was that the change in ownership of the Property was inconsequential and they were first in priority because they were first on site working under one, continuous contract. *See In re Corbin Park, L.P.*, 441 B.R. 370, 380 (Bankr. D.Kan.2010). The bankruptcy court concluded that there was not one continuous contract, and that under Kansas law, the work

performed under contract with Debtor created separate lien rights which could not be tacked to the former owner's contracts. Brown has not challenged this conclusion on appeal.

**35.** In its conclusions of law, the bankruptcy court, citing *Suitt Constr. Co., Inc. v. Hill*, 150 P.3d 335 (Kan.Ct.App.2007), stated, "[c]ontractors cannot artificially cause their mechanic's liens to attach by simply having one or more of its employees or subcontractors performing inconsequential activities at the site." *Corbin Park*, 441 B.R. at 380 n. 40. However, the bankruptcy court did not make application of this legal conclusion to any facts in the analysis section of its opinion, and thus it is not an integral part of its ruling.

property under a contract with Debtor prior to October 10, 2008. Debtor's contracts contained the contractors' promise not to begin work without a notice to proceed. The documents were fairly negotiated, and the parties understood the first requirement was for financing with BOA to close and a mortgage recorded. Although there is conflicting evidence, weighing the statements of the mechanic's lien claimants against the owner's statements made in 2008, the verified survey, and the written contracts executed by experienced, sophisticated construction companies, the Court finds the preponderance of the evidence established the mechanic's lien claimants' commencement date *under a contract with the owner* did not occur prior in time to BOA's mortgage. If the contractors were performing lienable work on Debtors property prior to October 9, they were there without Debtor's knowledge or consent and in breach of their agreements. But, the evidence did not establish they were working on Debtor's property. Several more credible sources say the contractors had understandably slowed or ceased work because 135 Metcalf was not paying them. What work did continue was limited to the J.C. Penney and Von Maur tracts. The mechanic's lien claimants' testimony was not credible regarding their commencement date, in part, because they refused to acknowledge the significance of the ownership change and the written

agreements they negotiated and executed.[36]

▪ Brown asserts it proved performance of lienable work during the critical time period because the bankruptcy court "accepted" both: 1) the testimony of Brown employee and project supervisor Randy Schultzen that he performed work on Debtor's Property during the first week of October 2008;[37] and 2) Brown's Pay Applications 1 and 2 under the site administration contract, which covered the periods August 24, 2008 to October 4, 2008, and October 5, 2008 to November 8, 2008.[38] While it is true that the testimony and pay applications were admitted into evidence, whether the bankruptcy court found them credible and sufficient to prove lienable work in light of the totality of the evidence presented is an altogether different question.

▪ Our review of the transcript indicates Mr. Schultzen testified that he performed erosion control and safety work for approximately a half hour to two hours per day during the first week of October 2008.[39] However, photographs taken by Mr. Schultzen, which were introduced into evidence during his testimony to substantiate the work being done on the Corbin Park job site, were all dated prior to July 23, 2008.[40] The bankruptcy court did not specifically state in its opinion that it found Mr. Schultzen's testimony lacked credibility.[41] However, it did remark in general

---

36. *Id.* at 382.

37. Brown's Opening Brief at 16.

38. *Id.* at 19.

39. *Transcript of Proceedings held November 2, 2010 ("Tr."),* at 172–73, *in* Brown's App. at 428–29.

40. *Tr.* at 170, *in* Brown's App. at 426.

41. With respect to the bankruptcy court's findings of facts, it stated:

> The trial involved 5 days of testimony and 30 exhibit notebooks containing thousands of pages, all of which was thoroughly reviewed by this Court. The Court has culled the material facts and does not attempt to discuss every fact and issue raised—not because they went unnoticed, but because they are deemed immaterial or lacking in credibility.

that "[t]he mechanic's lien claimants' testimony was not credible regarding their commencement date."[42] Additionally, while Brown introduced photographs that contemporaneously documented the work being performed prior to July 23, 2008, it did not do so for any date relevant to determining the priority of interests in this proceeding. Mr. Schultzen's testimony alone does not compel the conclusion that Brown performed lienable work on Debtor's Property during the first week of October 2008.

■ Our review of Pay Applications 1 and 2 under the site administration contract indicates that work billed for under Pay Application 2 was for the time period beginning October 11, 2008, which is after the date BOA's mortgage was filed and therefore not relevant.[43] Under Pay Application 1, it appears that some of the work billed did occur between September 16, 2008 and October 10, 2008.[44] However, there is nothing in the documentation submitted with Pay Application 1 that proves the work was being done on that part of the project that became the Debtor's Property as opposed to the pieces of Corbin Park that were acquired by J.C. Penney and Von Maur.

■ Based on other evidence, the bankruptcy court was persuaded that none of Brown's work on the Corbin Park project during this time period was being performed on Debtor's Property. The bankruptcy court relied on a verified land survey dated September 25, 2008.[45] Further, the bankruptcy court relied on email correspondence from a principal of Cormac to a title company representative dated September 23, 2008, which stated that no work was currently being done by the Contractors at Corbin Park except sitework on the Von Maur and J.C. Penney parcels.[46] Additionally, during cross-examination, Brown's president Tim Brown testified that some portion of the amount claimed under the mechanic's liens related to work performed on the tract of land owned by J.C. Penney.[47] In light of all of the evidence presented, we cannot conclude that the bankruptcy court's factual finding that Brown did not perform any lienable work on Debtor's Property prior to BOA's mortgage being filed is clearly erroneous.

■ Even if we were to conclude that such finding is clearly erroneous, Brown still could not meet the statutory requirement that such work was performed "under a contract with the owner." Brown alleges it performed lienable work during the first week of October 2008 because that time period is after the September 16, 2008 effective date of the contracts be-

---

*In re Corbin Park, L.P.,* 441 B.R. 370, 372 n. 2 (Bankr.D.Kan.2010).

**42.** *Id.* at 382.

**43.** *See Bill Breakdown # 2, in* Brown's App. at 1288.

**44.** *See Bill Breakdown # 1, in* Brown's App. at 1236. The Bill Breakdown shows labor costs for a senior project superintendent and administrative assistant for the weeks of 9/13/2008, 9/20/2008, and 9/27/2008, and for a senior project superintendent only for the week of 10/04/2008.

**45.** 441 B.R. at 374. *See ALTA/ACSM Land Title Survey for 135 Metcalf L.L.C., in* Brown's App. at 2558.

**46.** 441 B.R. at 374. *See Email Correspondence, in* Brown's App. at 2556.

**47.** *Tr.* at 18, *in* Brown's App. at 274. As pointed out by the bankruptcy court, "[t]his further illustrates why the mechanic's lien claimants' argument fails—they attempt to enforce a lien against *Debtor,* for work contracted for by [Metcalf] on J.C. Penney's property." 441 B.R. at 382 n. 45.

tween Debtor and Brown, and prior to BOA filing its mortgage on October 10, 2008. However, in this case, September 16, 2008 is not the determinative date with respect to performing lienable work on the property "under a contract with the owner." As suggested by the bankruptcy court's language quoted above, the September 16, 2008 effective date was not the *construction commencement date* under the contracts. Several provisions of the contracts prevented the Contractors from incurring costs or performing work thereunder prior to either: 1) receiving a written notice to proceed from Debtor; or 2) providing a written notice to Debtor at least five days in advance of commencing any work.[48] It is undisputed that Debtor did not issue a written notice to proceed with construction to Brown and Taylor Kelly until October 9, 2008.[49] Additionally, there is no evidence that Brown furnished Debtor with a written notice that it intended to commence construction.

At trial, Brown attempted to circumvent this contractual requirement by claiming it had received numerous "verbal notices to proceed" from Debtor prior to October 9, 2008.[50] However, the bankruptcy court did not find any credible evidence to support Brown's assertion that Debtor had issued a verbal notice to proceed.[51] Further, as the bankruptcy court noted, "[t]he contracts were negotiated between experienced, sophisticated parties represented by counsel and many provisions were changed and redlined in the course of negotiations."[52] At trial, Brown essentially asked the bankruptcy court to ignore these extensive written documents and instead give effect to its alleged verbal deviations therefrom. But the written contracts themselves provide that they may be amended only by written agreement

---

**48.** Section 2.2.7 of the construction contract provides as follows:

> Prior to the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of Notice to Proceed, the Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work, except as the Owner may specifically authorize in writing.

*Brown Exhibit A, Standard Form of Agreement Between Owner and Construction Manager where the Construction Manager is Also the Constructor ("Construction Contract")* at 5, *in* Brown's App. at 996.

Section 8.2.2 of the General Conditions of the Construction Contract provides as follows:

> The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanics liens and other security interests.

*Brown Exhibit A, General Conditions of the Construction Contract* at 27, *in* Brown's App. at 1075. The General Conditions are incorporated by reference into both the Construction Contract and the site administration contract. *See* § 1.2 of *Construction Contract* at 3, *in* Brown's App. at 994; and § 1.2 of *Brown Exhibit B, Standard Form of Agreement Between Owner and Construction Manager where the Construction Manager is Also the Constructor ("Site Administration Contract")* at 3, *in* Brown's App. at 1091.

**49.** 441 B.R. at 376. *See October 9, 2008, Letter from Jeffrey Johnson to Tim Brown* giving notice to proceed, *in* Brown's App. at 2551.

**50.** 441 B.R. at 376.

**51.** *Id.* at 376–77.

**52.** *Id.* at 375.

signed by both parties.[53]

Brown asserts it performed lienable work on Debtor's Property prior to the filing of BOA's mortgage. However, the bankruptcy court found that "[t]he testimony of all parties show[s] they were aware of the change in ownership, the secured financing, and were waiting for the Closing in order to begin the vertical build and the balance of the site work." [54] Additionally, the construction commencement date under the contracts did not occur until Debtor issued Brown a written notice to proceed as required by the contracts. As a result, if Brown performed work on Debtor's Property prior to October 10, 2008, such work does not meet the statutory requirement that it was performed "under a contract with the owner."

**B. The bankruptcy court's finding that Brown and its subcontractors were not performing work on Debtor's Property during the first week of October 2008 is not clearly erroneous.**

Brown argues that "[s]ubstantial testimony and contemporaneous corroborative documentary evidence submitted in this case conclusively establish that Brown's subcontractors were working on Debtor's Property during the first week of October 2008." [55] The evidence Brown relies on consists of: 1) the testimony of Mark Dombrowski, O'Donnell's project manager for the Corbin Park project; 2) an affidavit of Tim Spader, a foreman employed by McCorkendale; and 3) Brown's Pay Applications 1 and 2 under the retail buildings construction contract, which covered the periods August 24, 2008 to October 4, 2008, and October 5, 2008 to November 8, 2008, respectively.

First, Brown points to Mr. Dombrowski's testimony that O'Donnell was "doing grading operations in Phase 1, Phase 6, and Phase 2" as evidence of subcontractor work occurring on Debtor's Property during the first week of October 2008.[56] Our review of the record indicates that neither of the invoices submitted by O'Donnell to Brown on September 18, 2008, and October 9, 2008, references any work being done on Phases, 1, 2, or 6. Instead, both invoices reference earthwork and grading with respect to Phase 3A and Phase 3–1A.[57] Phase 3A is the Von Maur site, which is not part of the Debtor's Property. Moreover, both of O'Donnell's invoices are clearly marked "Corbin Park—Von Maur Sitework." [58]

Brown also points to an affidavit made on March 31, 2010, by Tim Spader, a McCorkendale foreman, in which he states that during the first week of October 2008 he was encasing sanitary sewer lines with concrete in Phase 1A of the project.[59] Brown argues that Mr. Spader's time cards and daily logs support the content of

**53.** See § 9.2.2 of *Construction Contract* at 17, in Brown's App. at 1008; § 9.2.2 of *Site Administration Contract* at 17, in Brown's App. at 1105.

**54.** 441 B.R. at 377.

**55.** Brown's Opening Brief at 33.

**56.** *Id.* at 34.

**57.** *O'Donnell's Subcontractor's Application for Payment Continuation Sheet in Brown's Exhibit F–1* at 14, in Brown's App. at 1201; *O'Donnell's Subcontractor's Application for Payment Continuation Sheet in Brown's Exhibit F–2* at 7, in Appellant's App. at 1228.

**58.** *O'Donnell's Subcontractor's Application for Payment in Brown's Exhibit F–1* at 13 in Brown's App. at 1200; *O'Donnell's Subcontractors Application for Payment in Brown's Exhibit F–2* at 6, in Brown's App. at 1227.

**59.** *Affidavit of Tim Spader, in* Brown's App. at 2561.

his affidavit and prove lienable work on Debtor's Property. However, although the time cards reference "Corbin Park," [60] and the daily logs note "encasement work," [61] there is nothing to indicate whether such encasement work was being performed on Debtor's Property, as opposed to elsewhere on the Corbin Park project.

Brown also argues that Pay Applications 1 and 2 under the construction contract, which were submitted to and paid by Debtor, prove that its subcontractors were performing work on Debtor's Property during the relevant time period.[62] Under Brown's Pay Application 1, O'Donnell's invoice covers the period July 19, 2008 to September 18, 2008, and McCorkendale's invoice covers the period August 21, 2008 to September 17, 2008.[63] Therefore, all of the subcontractor work under Pay Application 1 predated both Debtor's acquisition of the Property on October 8, 2008, and the written notice to proceed under the contract which was issued on October 9, 2008. Additionally, almost all of the work was performed before the effective date of the construction contract between Brown and Debtor. Moreover, the invoices cover work that could have been done even before Debtor was formed as a legal entity on September 8, 2008. It would be difficult to conclude that any of the subcontractor work invoiced under Pay Application 1 was performed "under a contract with Debtor."

Under Brown's Pay Application 2, O'Donnell's invoice covers the period September 19, 2008 to October 9, 2008. The only charge reflected on that invoice is for an increase in the cost of asphalt cement for Phase 3A, which again, is the Von Maur site and not part of Debtor's Property.[64] McCorkendale's invoice covers the period September 18, 2008 to October 5, 2008, and reflects charges only for encasement of sanitary lines for Phases 5 and 6. Phase 5 is the NYLO Hotel site and not part of Debtor's Property, and although most of Phase 6 became part of Debtor's Property, it also contains the J.C. Penney pad site which did not.[65] Additionally, the McCorkendale invoice is inconsistent with

---

60. *See Daily Time Card of Tim Spader dated October 11, 2008, in* Brown's App. at 2581.

61. *See Daily Logs of Tim Spader dated October 2, 6, and 8, 2008, in* Brown's App. at 2582–84.

62. It is clear that the subcontractor invoices billed under Brown's Pay Applications 1 and submitted to Debtor actually relate to work that is properly considered as performed under Brown's contract with prior owner Metcalf. The O'Donnell invoices are numbered five and six, and reference subcontract change orders. McCorkendale's invoices are numbered nine and ten, and reference subcontract change orders eight and nine.

63. *O'Donnell's Subcontractor's Application or Payment in Brown's Exhibit F–1 at 13, in* Brown's App. at 1200; *McCorkendale's Subcontractor's Application for Payment in Brown's Exhibit F–1 at 17, in* Brown's App. at 1204.

64. *O'Donnell's Subcontractor's Application for Payment Continuation Sheet in Brown's Exhibit F–2 at 7, in* Appellant's App. at 1228. According to Brown's Corbin Park Interim Budget, Phase 3A was Von Maur Sitework. *See Corbin Park Retail Development Cash Flow Forecast, in* Appellant's App. at 1362.

65. *McCorkendale's Subcontractor's Application for Payment Continuation Sheet in Brown's Exhibit F–2 at 10, in* Brown's App. at 1231. According to the Monthly Progress Report 1 prepared by Marx/Okubo Associates, Inc. for Invesco and BOA in December 2008, Phase 5 of the project included the NYLO Hotel and Phase 6 of the project included the J.C. Penney building site. *See Corbin Park Master Design/Construction Schedule, in* Brown's App. at 2054–55. Thus some of the sitework in these phases may have been performed on property that was conveyed to J.C. Penney Properties, Inc. and Overland Park Loft Hotels, LLC.

the affidavit of its employee Tim Spader discussed above, in which he stated the encasement work was performed in Phase 1A of the project.

The evidence Brown proffers in its effort to prove that O'Donnell and McCorkendale were performing work that would give the mechanic's liens priority over BOA's mortgage contains inconsistencies. Further, there is other evidence in the record to support a conclusion to the contrary. For example, although he stopped short of admitting that work on the Property had ceased completely, Tim Brown testified at trial that O'Donnell and McCorkendale had "slowed their work down substantially" in the time period immediately prior to the BOA closing.[66] Additionally, the record contains an email from Jeff Johnson of Cormac to Tim Brown dated October 22, 2008, asking Brown if he had any idea when O'Donnell and McCorkendale would physically be on site.

Brown also argues extensively in its brief that the bankruptcy court erroneously relied on the verified land survey to support its factual finding that the Contractors were not performing work on Debtor's Property during the relevant time period.[67] In fact, Brown claims the survey supports the opposite conclusion. The bankruptcy court stated "[a] verified land survey dated September 25, 2008, notes the only work ongoing at that time was on the Von Maur and J.C. Penney sites."[68] According to Brown, such conclusion is erroneous because the survey excluded the Von Maur and J.C. Penney sites.[69]

Given that the survey appears to have been prepared in connection with the sale of the property by Metcalf to Debtor, who did not purchase the Von Maur and J.C. Penney sites, Brown's interpretation of the survey makes logical sense. However, this does not necessarily mean the bankruptcy court's ultimate finding that no work was occurring on Debtor's Property during the relevant time period is conclusively foreclosed by Brown's interpretation of the survey.

Brown points to surveyor's note number 8, which states, "[t]here is observable evidence of recent earth moving work, there is observable evidence of recent building construction or building additions within recent months."[70] Even if the surveyor's note relates to work being performed on Debtor's Property because the survey covers only property owned by Debtor, it does not establish that such work was done under a contract with Debtor as owner of the property. The survey is dated September 25, 2008, and the surveyor's note indicates "recent earth moving work" and construction work "within recent months." Thus, even if September 16, 2008, and not the construction commencement date under the contracts, is deemed the relevant date for beginning work under a contract with the owner, the survey does not definitively establish that the Contractors performed work after such date.

At trial, the bankruptcy court was presented with an enormous amount of testimony and documentary evidence, some of

---

66. *Tr.* at 72–73, in Brown's App. at 328–29.

67. Brown's Opening Brief at 37–40.

68. 441 B.R. at 374.

69. Brown's Opening Brief at 38. Brown interprets the vicinity maps shown on each

page of the survey as excluding Tracts 17 and 26, those transferred to Von Maur and J.C. Penney, respectively. *Id.*

70. *See ALTA/ACSM Land Title Survey for 135 Metcalf L.L.C., in* Brown's App. at 2560.

which can be interpreted to support the Contractors' claims. But, in reviewing findings of fact under the clearly erroneous standard, this Court must defer to the bankruptcy court's assessment of the credibility of witnesses and other disputed facts,[71] because the trier of fact is usually in a superior position to appraise and weigh the evidence.[72] On the whole, the bankruptcy court's factual findings are substantiated by the evidence in the record on appeal. In turn, the factual findings support the bankruptcy court's conclusion that the Contractors' did not meet their burden of proving themselves clearly within the provisions of the mechanic's lien statute. Based on our review of the record on appeal, we do not have a definite and firm conviction that a mistake has been made.

## C. The bankruptcy court did not hold that Brown was in breach of the Construction Contract and that such breach defeated priority of its mechanic's lien.

In its third assignment of error, Brown argues that the bankruptcy court erred in finding that Brown was in breach of the construction contract and that breach defeated the priority of the mechanic's liens on Debtor's Property.[73] Additionally, Brown asserts that even if it breached the agreement: 1) Debtor never declared a breach of the contract, and thus any breach has been waived; and 2) a breach of contract does not affect the priority of its mechanic's liens.[74] Again, in its effort

to demonstrate error, Brown misconstrues the bankruptcy court's ruling, this time by expanding it far beyond its scope.

In its opinion, the bankruptcy court stated only the following regarding a breach of agreement by the Contractors:

> The mechanic's lien claimants did not carry their burden to persuade the Court they were on Debtor's property performing work which improved the property under a contract with Debtor prior to October 10, 2008.... *If the contractors were performing lienable work on Debtor's property prior to October 9, they were there without Debtor's knowledge or consent and in breach of their agreements.* **But,** *the evidence did not establish they were working on Debtor's property.*[75]

The bankruptcy court found as a matter of fact that Debtor did not give Brown the required written notice to proceed under the contracts, and that Brown's testimony regarding Debtor's verbal notices to proceed was not credible. We view the bankruptcy court's statements as supporting its conclusions that the Contractors could not place themselves within the mechanic's lien statutory language because they did not meet the requirement that worked be performed "under a contract with the owner" of the Property. Brown's interpretation of the bankruptcy court's holding, i.e., that the Contractors performed work giving rise to a lien that attached prior to filing of BOA's mortgage but that the priority of such lien was defeated by a breach of contract, is quite a stretch.

**71.** *In re Ford,* 492 F.3d 1148, 1154 (10th Cir.2007); Fed.R.Civ.P. 52(a)(6); Fed. R. Bankr.P. 8013.

**72.** *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

**73.** Brown's Opening Brief at 25.

**74.** *Id.* at 26.

**75.** 441 B.R. at 382 (emphasis added).

The bankruptcy court also found that "[t]he testimony of all parties show[s] they were aware of the change in ownership, the secured financing, and were waiting for the Closing in order to begin the vertical build and the balance of the site work."[76] Thus, the bankruptcy court's statement that "[i]f the contractors were performing lienable work on Debtor's property prior to October 9, they were there without Debtor's knowledge or consent and in breach of their agreements," was likely intended to convey the general idea that fairness or equity would prevent the Contractors from intentionally disregarding the commencement date and notice to proceed requirements under the construction contracts in order to create a lien that would prime the mortgage.

Brown's argument regarding breach of contract and the effect of breach is a red herring that misleads or distracts from the bankruptcy court's actual holding. The bankruptcy court's hypothetical statement regarding the Contractors' breach of the agreement comes nowhere near reversible error.

### D. The bankruptcy court's priority determination is not premised on the holding in *Shade v. Wheatcraft Industries, Inc.*

In its fourth assignment of error, Brown argues that its "knowledge that BOA would provide secured financing at some future date does not defeat the priority of Brown's mechanic's liens and the Bankruptcy Court erred in its application of *Shade v. Wheatcraft Industries, Inc.*, 248 Kan. 531, 809 P.2d 538 (1991) to conclude

otherwise."[77] Further, Brown asserts that "*Shade* is not applicable in this case at all."[78] We agree that *Shade* is not strictly applicable to the facts presented here. However, we conclude that the bankruptcy court's ruling is not premised on the application of *Shade*, and as a result there is no reversible error.

In *Shade*, the question presented was "whether a purchase money mortgage loses its priority to a mechanic's lien that attaches after execution of the mortgage but before the purchase money mortgage is recorded."[79] The Kansas Supreme Court held "[i]f the mechanics' lienholders had no actual notice of the prior mortgage, the answer is 'Yes.'"[80] In that case, a mortgage was given in September 1987, but not recorded until January 1988, and the mechanic's lien claimants, without knowledge of the unrecorded mortgage, began their work on the real property in October 1987.

In this case, BOA's mortgage was given on October 8, 2008, and filed on October 10, 2008, and the Contractors argue they began work prior to October 8, 2008. Additionally, BOA's mortgage relates to a construction loan and not a purchase money mortgage. As a result, even if we assumed the Contractors were performing lienable work on Debtor's Property during the first week of October, the Kansas Supreme Court's holding in *Shade* would not resolve the priority dispute in this case, because in addition to the difference between the factual timing situations, there remains the question of whether the Contractors were performing work under a

76. *Id.* at 377.

77. Brown's Opening Brief at 46.

78. *Id.*

79. *Shade v. Wheatcraft Indus., Inc.*, 248 Kan. 531, 809 P.2d 538 (1991).

80. *Id.*

contract with Debtor as owner of the Property.

As BOA points out in its brief, the bankruptcy court did not literally apply the holding in *Shade* to reach its conclusion in this case.[81] Instead, we believe the bankruptcy court used the discussion in *Shade* to demonstrate that the Contractors had not been disadvantaged by any questionable or negligent behavior on the part of Debtor or BOA. The bankruptcy court stated "[p]art of the reason for priming the purchase money mortgage in *Shade* was to discourage lenders from holding secret mortgages, allowing their collateral to be improved at the mechanic's lienholders' expense, then foreclosing upon the property and improvements."[82] The bankruptcy court was simply pointing out that in this case, the Contractors had full knowledge of the situation. In other words, they knew that the property they had been working on was in the process of being sold to a new owner, that an infusion of capital from new sources was necessary in order to proceed with the project, and that the new investors would do so only with a first priority lien.

**E. The bankruptcy court did not err in concluding that *Mutual Savings Association v. Res/Com Properties, L.L.C.* was not controlling precedent.**

O'Donnell joins in Brown's alleged errors on appeal, and asserts an additional error by the bankruptcy court in its supplemental brief. Specifically, O'Donnell argues "that it is uniquely situated because it began working on the debtor's property in 2003 and the lower court erred in finding *Mutual Savings Ass'n v. Res/Com Properties, L.L.C.*, 32 Kan.App.2d 48, 79 P.3d 184 (2003), was not controlling precedent."[83] We disagree.

As previously stated, the primary thrust of the Contractors' arguments at trial was that the change in ownership of the Property was inconsequential and they were first on site working under one, continuous contract.[84] The Contractors relied heavily on the *Mutual Savings* case in support of this argument.[85] The bankruptcy court determined that *Mutual Savings* was of questionable precedential value because of changes made by the Kansas legislature to the mechanic's lien statute in 2005, following the 2003 *Mutual Savings* decision.[86]

In *Mutual Savings*, the current owner of real property engaged an initial contractor to perform design and engineering services and preparatory site work. As in the case at bar, the real property was subsequently sold before the initial contractor's work was completed.[87] The new owner purchased the property with funds from a lender who took and filed a first mortgage in the real property. Following the sale of the property, the initial contractor entered into a contract with the new owner who engaged a general contractor, and two subcontractors were hired by the general contractor. Soon after completing or stopping work on the property, the contractors filed their mechanic's liens of record. Several months later, the lender paid the ini-

**81.** BOA's Brief in Reply to Brown's Opening Brief at 22.

**82.** 441 B.R. at 383.

**83.** O'Donnell's Supplemental Brief at 3.

**84.** *See* 441 B.R. at 380.

**85.** 441 B.R. at 382.

**86.** *Id.*

**87.** *Mut. Savs. Ass'n v. Res/Com Props., L.L.C.*, 32 Kan.App.2d 48, 79 P.3d 184, 187 (2003).

tial contractor for its work, took assignment of its lien, and filed a release of that lien. The new owner of the real property then defaulted, and the lender instituted foreclosure proceedings. At that time, the mechanic's liens of the two subcontractors remained unsatisfied. The Kansas trial court found that the subcontractor's liens were not entitled to priority by "relating back" to the initial contractor's work, which occurred prior to sale of the property to the new owner and filing of the lender's mortgage.[88] The subcontractors appealed.

The Kansas Court of Appeals stated that "[t]he central issue on appeal is when and if [the contractor's] work, done prior to [lender's] mortgage, became lienable and attached."[89] The appellate court was tasked with interpreting that part of the Kansas mechanic's lien statute that provides "[w]hen two or more such contracts are entered into applicable to the same improvement, the liens of all claimants shall be similarly preferred to the *date of the earliest unsatisfied lien* of any of them."[90] It held that "the date used to determine who was an unsatisfied lien holder for priority purposes, is the date when [the lender] filed its mortgage from [the owner]."[91] Applying that rule, the Kansas Court of Appeals reversed the trial court, concluding that on the date the new owner's lender filed its first mortgage, the initial contractor held an unsatisfied lien. Thus, the subcontractors' liens related

back and were perfected as of the date the initial contractor started work on the property.[92]

Approximately two years after *Mutual Savings* was decided, the Kansas legislature amended the mechanic's lien statute. Specifically applicable to this case, the legislature added the following sentence: "If an earlier unsatisfied lien is paid in full or otherwise discharged, the commencement date for all claimants shall be the date of the next earliest unsatisfied lien."[93] In this case, the bankruptcy court held that because the Contractors had been paid for the work done under the contract with previous owner Metcalf, their mechanic's liens could not relate back to a date prior to BOA's mortgage. O'Donnell argues that the bankruptcy court erred in determining its lien did not have priority over BOA's mortgage because it began work on the Property in 2003, and "[i]t has been paid for some of its work, but not all as evidenced by its mechanic's lien."[94]

■ O'Donnell may have begun work on the Corbin Park project before the other Contractors, but we fail to see how, as it claims, it is "uniquely situated." Our review of O'Donnell's mechanic's lien claim form filed in the bankruptcy case,[95] and the testimony of Mark Dombrowski, O'Donnell's project manager for the Corbin Park project,[96] does not indicate that any of the amounts O'Donnell claims relate to work or costs other than those incurred

**88.** *Id.* at 188.

**89.** *Id.* at 189.

**90.** Kan. Stat. Ann. § 60–1101 (emphasis added).

**91.** *Mut. Savs.*, 79 P.3d at 196.

**92.** *Id.* at 196–97.

**93.** Kan. Stat. Ann. § 60–1101.

**94.** O'Donnell's Supplemental Brief at 9.

**95.** *Mechanic's Lien Claim Form, in* O'Donnell's Supp. App. at 232 of 404.

**96.** *Tr.* at 186–226, *in* Brown App. at 442–482, and *Transcript of Proceedings on November 3, 2010*, at 92–117, *in* Brown App. at 574–600.

under the contracts Brown had with previous owner Metcalf or Debtor. Therefore, O'Donnell is in the same position as the other Contractors for purposes of the bankruptcy court's conclusion that a lien relating to work performed under contract with Debtor as the new owner of the Property could not "relate back" to work performed under Brown's contract with prior owner Metcalf because any lien relating to work performed under contract with Metcalf had been satisfied by way of payment from Debtor.[97]

In reality, O'Donnell's additional argument on appeal is the same one made to and rejected by the bankruptcy court. O'Donnell asserts that *"Mutual Savings* stands for much more than which date is significant for priority purposes," and argues it remains controlling precedent that permits a mechanic's lien holder to tack work performed under a contract with a current owner of property to work performed under a different contract with a prior owner.[98] However, as the bankruptcy court points out, in *Mutual Savings,* the Kansas Court of Appeals did not address the singleness of a contract or different owners of the property.[99] Nor did it make any attempt to reconcile its holding with previous decisions of the Kansas Supreme Court that prohibit tacking of successive contracts, especially when different owners are involved.[100] As a result, O'Donnell's argument that *Mutual Savings* dictates a

different result with respect to its claim in this case is unpersuasive.

## V. CONCLUSION

The Contractors appear to have asked this Panel to review the bulk of the testimony and documentary evidence presented to the trial court with the optimistic but mistaken hope that putting three heads together would lead to a more favorable result.[101] But we are necessarily guided by the principles of Federal Civil Rule of Procedure 52, made applicable to bankruptcy appeals by Federal Rule of Bankruptcy Procedure 8013, as well as prior binding case law, which illustrate that the important and frequently decisive role of fact finding is committed to the trial court, and not this Court.[102] We conclude that the bankruptcy court committed no reversible error. Therefore, its determination that BOA's mortgage has priority over the Contractors' mechanic's liens is AFFIRMED.

---

**97.** Further, even if the lien for work performed under contract with prior owner Metcalf had not been satisfied, no lien was ever perfected by being filed of record, and the period for timely doing so had long since run. Kansas statutes require a mechanic's lien to be filed within four months (or five months with an extension) of the date materials are last furnished or labor last performed. *See* Kan. Stat. Ann. § 60–1102(a) & (c).

**98.** O'Donnell's Supplemental Brief at 7–8.

**99.** 441 B.R. at 382.

**100.** *Id.*

**101.** *See Hughes Tool Co. v. Varel Mfg. Co., Inc.,* 336 F.2d 61, 62 (5th Cir.1964).

**102.** *See id.*